FILED
2023 Sep-26  PM 02:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **RACHEL M. GORECKI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:22-cv-00822-AMM** |
| | ) | |
| **SOCIAL SECURITY** | ) | |
| **ADMINISTRATION,** | ) | |
| **Commissioner,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OF DECISION

Plaintiff Rachel M. Gorecki brings this action pursuant to the Social Security Act (the "Act"), seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying her claim for a period of disability and disability insurance benefits ("benefits"). *See* 42 U.S.C. § 405(g). Based on the court's review of the record, the court **AFFIRMS** the decision of the Commissioner.

## I.    Introduction

On September 4, 2019, Ms. Gorecki protectively filed an application for benefits under Title II of the Act, alleging disability as of August 14, 2019. R. 20, 68–78. Ms. Gorecki alleges disability due to pulmonary fibrosis, asthma, pulmonary embolism, deep vein thrombosis, anemia, suppressed immune system, chronic upper respiratory infections, osteoarthritis, depression, and anxiety. R. 68–69. She has at

1

least a high school education and past relevant work experience as a salesclerk and cook helper. R. 33.

The Social Security Administration ("SSA") initially denied Ms. Gorecki's application on November 1, 2019, and again upon reconsideration on December 10, 2020. R. 20, 68–78, 80–102. On December 22, 2020, Ms. Gorecki filed a request for a hearing before an Administrative Law Judge ("ALJ"). R. 20, 122–123. That request was granted. R. 124–26. Ms. Gorecki received a telephone hearing before ALJ Jerome L. Munford on August 11, 2021. R. 20, 40–67. On September 28, 2021, ALJ Munford issued a decision, finding that Ms. Gorecki was not disabled from August 14, 2019 through the date of the decision. R. 20–34. Ms. Gorecki was thirty-four years old at the time of the ALJ decision. R. 33–34.

Ms. Gorecki appealed to the Appeals Council, which denied her request for review on March 11, 2022. R. 6–8. After the Appeals Council denied Ms. Gorecki's request for review, R. 6–8, the ALJ's decision became the final decision of the Commissioner and subject to district court review. The Appeals Council then granted Ms. Gorecki's request for additional time within which to file a civil action. R. 1–2. On July 5, 2022, Ms. Gorecki sought this court's review of the ALJ's decision. *See* Doc. 1.

## II.    The ALJ's Decision

The Act establishes a five-step test for the ALJ to determine disability. 20 C.F.R. § 404.1520. *First*, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). "Substantial work activity is work activity that involves doing significant physical or mental activities." 20 C.F.R. § 404.1572(a). "Gainful work activity" is work that is done for pay or profit. 20 C.F.R. § 404.1572(b). If the ALJ finds that the claimant engages in substantial gainful activity, then the claimant cannot claim disability. 20 C.F.R. § 404.1520(b). *Second*, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii), (c). Absent such impairment, the claimant may not claim disability. *Id*. *Third*, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526. If such criteria are met, the claimant is declared disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ still may find disability under the next two steps of the analysis. The ALJ must first determine the claimant's residual functional capacity, which refers to the claimant's ability to work despite her impairments. 20

C.F.R. §§ 404.1520(e), 404.1545. In the *fourth* step, the ALJ determines whether the claimant has the residual functional capacity to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the ALJ determines that the claimant is capable of performing past relevant work, then the claimant is deemed not disabled. *Id*. If the ALJ finds the claimant unable to perform past relevant work, then the analysis proceeds to the *fifth* and final step. 20 C.F.R. § 404.1520(a)(4)(v). In this step, the ALJ must determine whether the claimant is able to perform any other work commensurate with her residual functional capacity, age, education, and work experience. 20 C.F.R. § 404.1520(g)(1). Here, the burden of proof shifts from the claimant to the Commissioner to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given her residual functional capacity, age, education, and work experience. 20 C.F.R. §§ 404.1520(g)(1), 404.1560(c).

The ALJ determined that Ms. Gorecki would meet the insured status requirements of the Act through December 31, 2023. R. 20, 22. Next, the ALJ found that Ms. Gorecki "has not engaged in substantial gainful activity since August 14, 2019, the alleged onset date." R. 22. The ALJ decided that Ms. Gorecki had the following severe impairments: history of pulmonary embolism, history of deep vein thrombosis, asthma, pulmonary fibrosis, multilevel degenerative changes of L4-5 and L5-S1 without acute abnormality, obesity, depression, and anxiety. R. 22. The

ALJ found that Ms. Gorecki's sinusitis, interstitial cystitis, and obstructive sleep apnea were not severe impairments because "the objective evidence fails to show that symptoms . . . would have more than a minimal effect on the claimant's ability to perform basic work activities." R. 22–23. The ALJ found that Ms. Gorecki's "migraines/primary headache disorder cannot be established as a medically determinable impairment." R. 23. Overall, the ALJ determined that Ms. Gorecki did not have "an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" to support a finding of disability. R. 23.

The ALJ found that Ms. Gorecki had the "residual functional capacity to perform light work" with certain limitations. R. 25. The ALJ determined that Ms. Gorecki could occasionally: stoop; crouch; crawl; kneel; and climb ladders, ropes, scaffolds, ramps, and stairs. R. 25. The ALJ prohibited: concentrated exposure to extreme cold, heat, or pulmonary irritants. R. 25. The ALJ determine that Ms. Gorecki could understand, remember, and carry out simple, routine tasks involving one- or two-step instructions, but should have minimum job-related changes. R. 25.

The ALJ determined that Ms. Gorecki's past relevant work was that of a salesclerk and cook helper. R. 33. The ALJ determined Ms. Gorecki is "unable to perform any past relevant work." R. 33.

According to the ALJ, Ms. Gorecki is "a younger individual" and has "at least a high school education," as those terms are defined by the regulations. R. 33. The ALJ determined that "[t]ransferability of job skills is not material to the determination of disability." R. 33. Because Ms. Gorecki's "ability to perform all or substantially all of the requirements of [light] work has been impeded by additional limitations," the ALJ enlisted a vocational expert to ascertain whether there were a significant number of jobs in the national economy that Ms. Gorecki was capable of performing. R. 34. That expert concluded that there were indeed a significant number of such jobs in the national economy, such as a garment sorter, inspector, and tagger. R. 34.

Based on these findings, the ALJ concluded that Ms. Gorecki was not under a disability as defined in the Act, from August 14, 2019, through the date of the ALJ's decision. R. 34. Ms. Gorecki now challenges that decision.

## III.   Standard of Review

This court's role in reviewing claims brought under the Act is a narrow one. The only issues before this court are whether the record reveals substantial evidence to sustain the Appeal Council's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied, *see Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The Act mandates that the

Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *see* 42 U.S.C. § 405(g). This court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the record as a whole and determine if the decision is reasonable and supported by substantial evidence. *See Martin*, 894 F.2d at 1529 (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239). If the Commissioner's factual findings are supported by substantial evidence, they must be affirmed even if the preponderance of the evidence is against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. No decision is automatic, for "[d]espite th[e] deferential standard [for review of claims], it is imperative that th[is] Court scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987) (citing *Arnold v. Heckler*, 732 F.2d 881, 883 (11th Cir. 1984)). Failure to apply the correct legal standards is grounds for reversal. *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

## IV.   Discussion

Ms. Gorecki argues that "[t]he ALJ's subjective testimony analysis is not supported by substantial evidence"; "[t]he ALJ erred by not finding Gorecki's primary headache was a medically determinable impairment, and his [residual functional capacity] failed to account for limitations associated with Gorecki's headache disorder"; and "[t]he ALJ who heard Gorecki's claim was not appointed properly under the Constitution's Appointment Clause." Doc. 11 at 1.

## A. The ALJ's Evaluation Under the Pain Standard

A claimant's subjective complaints are insufficient to establish a disability. *See* 20 C.F.R. § 404.1529(a); *Edwards v. Sullivan*, 937 F.2d 580, 584 (11th Cir. 1991). Subjective testimony of pain and other symptoms may establish the presence of a disabling impairment if it is supported by medical evidence. *See Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995). The Eleventh Circuit applies a two-part pain standard when a claimant claims disability due to pain or other subjective symptoms. The claimant must show evidence of an underlying medical condition and either (1) objective medical evidence that confirms the severity of the alleged symptoms arising from the condition, or (2) that the objectively determined medical condition is of such severity that it can reasonably be expected to give rise to the alleged symptoms. *See* 20 C.F.R. § 404.1529(a), (b); Social Security Ruling 16-3p, 2017 WL 5180304, at *3–*4 (Oct. 25, 2017) ("SSR 16-3p"); *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002).

If the first part of the pain standard is satisfied, the ALJ then evaluates the intensity and persistence of a claimant's alleged symptoms and their effect on her ability to work. *See* 20 C.F.R. § 404.1529(c); *Wilson*, 284 F.3d at 1225–26. In evaluating the extent to which a claimant's symptoms affect her capacity to perform basic work activities, the ALJ will consider (1) objective medical evidence, (2) the nature of a claimant's symptoms, (3) the claimant's daily activities, (4) precipitating and aggravating factors, (5) the effectiveness of medication, (6) treatment sought for relief of symptoms, (7) any measures the claimant takes to relieve symptoms, and (8) any conflicts between a claimant's statements and the rest of the evidence. *See* 20 C.F.R. § 404.1529(c)(3), (4); SSR 16-3p at *4, *7–*8. To discredit a claimant's statements, the ALJ must clearly "articulate explicit and adequate reasons." *See Dyer*, 395 F.3d at 1210.

An ALJ's review "must take into account and evaluate the record as a whole." *McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986). There is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision. *Jacobus v. Comm'r of Soc. Sec.*, 664 F. App'x 774, 776 (11th Cir. 2016). Instead, the ALJ must consider the medical evidence as a whole and not broadly reject the evidence in the record. *Id.*

A determination under the pain standard is a question of fact subject only to limited review in the courts to ensure the finding is supported by substantial

evidence. *See Hand v. Heckler*, 761 F.2d 1545, 1548–49 (11th Cir. 1985), *vacated for rehearing en banc*, 774 F.2d 428 (11th Cir. 1985), *reinstated sub nom., Hand v. Bowen*, 793 F.2d 275 (11th Cir. 1986). The Eleventh Circuit will not disturb a clearly articulated finding supported by substantial evidence. *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014). However, a reversal is warranted if the decision contains no indication of the proper application of the pain standard. *See Ortega v. Chater*, 933 F. Supp. 1071, 1076 (S.D.F.L. 1996) (holding that the ALJ's failure to articulate adequate reasons for only partially crediting the plaintiff's complaints of pain resulted in reversal). "The question is not . . . whether [the] ALJ could have reasonably credited [claimant's] testimony, but whether the ALJ was clearly wrong to discredit it." *Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

Ms. Gorecki argues that "[t]he ALJ never made th[e] mandatory finding[]" under SSR 16-3p to "consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms." Doc. 11 at 10; SSR 16-3p. Ms. Gorecki further argues that "[t]he ALJ's evaluation rested on the objective evidence substantiating Gorecki's complaints of pain," but did not consider "daily activities; precipitating and aggravating factors; type, dosage, and effects of medications; and treatment or measures taken by Gorecki for relief of symptoms." Doc. 11 at 11. With respect to

the medical treatments Ms. Gorecki testified that she used, she also argues that "[t]he ALJ did not explain how he considered this evidence before determining Gorecki's" residual functional capacity. *Id.* at 12.

*First*, the ALJ correctly applied the Eleventh Circuit's pain standard and made the requisite findings. After explaining the pain standard, with citations to 20 C.F.R. 404.1529 and SSR 16-3p, the ALJ considered Ms. Gorecki's testimony about her symptoms. *See* R. 25–26. The ALJ described as follows Ms. Gorecki's testimony about the issues raised by Ms. Gorecki on appeal:

> . . . The claimant also reported experiencing migraine headaches and that she has about eight migraines a month which can last two to four days.
> . . .
> . . . The claimant stated that she takes globin-infusion shots once a week for her immune system issues, although the injections are not always effective, as she still experiences infections. She said the effects of the injection lasts for about four hours, resulting in extreme nausea, vomiting and fatigue. The claimant reported that she uses steroid treatments for her breathing problems which can take between five and fifteen minutes to administer. . . . The claimant explained that she takes two medications for her headaches and hot patches for her pain.

R. 26.

The ALJ made the requisite finding that "[t]he medical evidence of record confirms a history of pulmonary embolism and deep vein thrombosis, as well as asthma, pulmonary fibrosis, and multilevel degenerative changes of L4-5 and L5-S1 without acute abnormality, however, the objective evidence does not support the

claimant's allegations of disabling functional limitations from these impairments." R. 27; *see* R. 27–31 (impairment-by-impairment discussion of medical evidence of record).

*Second*, the ALJ articulated explicit and adequate reasons for discrediting Ms. Gorecki's allegations of disabling symptoms. "After having carefully considered the documentary record," the ALJ stated, Ms. Gorecki's "description of her impairments and resulting limitations are not entirely consistent in light of the medical history, reports from examining practitioners and clinical findings on examination." R. 31. The ALJ stated that "[i]n this case, the claimant's functional abilities indicate a good tolerance for some level of work activity, and limitations related to the claimant's severe impairments have been allowed for in the residual functional capacity . . . . Despite claiming a complete inability to work, the record provides no convincing evidence over time, and the undersigned cannot find the testimony and alleged limitations of the claimant to be well-supported by the evidence of record." R. 31.

The ALJ stated that "[t]he claimant also testified to debilitating side effects from her globin infusion therapy, yet her records do not confirm such problem or that she even reported the same (Exhibits 7F, 9F–11F, 15F, 16F, 18F, 19F and 20F–24F)." R. 27. The ALJ later noted that at an October 22, 2019 ENT visit, Ms. Gorecki "was tolerating Hizentra Immune Globulin subcutaneously without adverse side effects and was otherwise doing well." R. 29.

12

At the hearing Ms. Gorecki testified that she can perform immunoglobulin infusions herself, but they result in "extreme nausea, vomiting, and fatigue" and will "take [her] down for days." R. 53.

The ALJ's evaluation of Ms. Gorecki's symptoms was thorough and substantial evidence supports his conclusion. The ALJ summarized Ms. Gorecki's medical records. These medical records support Ms. Gorecki's testimony that she uses multiple types of breathing treatments daily for her asthma. *See* R. 367–369, 435, 444, 513, 545, 694. However, those records do not indicate she experienced any side effects from those breathing treatments that would undermine her ability to work. *See* R. 367–369, 435, 444, 513, 545, 694.

The medical records discuss Ms. Gorecki's IVIG infusions that she received in 2017, prior to the alleged onset date, and distinct from the Hizentra infusions that were the subject of Ms. Gorecki's hearing testimony. For example, in September 2017, Ms. Gorecki presented to the St. Vincent's Emergency Department with a headache. R. 348. The St. Vincent's medical records state that Ms. Gorecki "indicate[d] that she ha[d] been receiving IVIG infusions every month since February. She report[ed] that the IgG induce[d] significant headaches, every infusion is followed by bad headache for several days." R. 348; *see also* R. 1075. Ms. Gorecki reported that she "tried . . . different IVIG brands without any benefit." R. 348; *see also* R. 595 (April 30, 2019 record that states Ms. Gorecki "experienced severe

headache after each infusion of IVIG"). After receiving an IGG infusion on February 24, 2017, Ms. Gorecki reported being nauseous for a week. R. 766. The medical records indicate that she discontinued IVIG replacement after May 2017. R. 595, 624, 1075.

Ms. Gorecki began Hizentra infusions in 2019, *see* R. 1086, and those medical records do not indicate the same disabling side effects as Ms. Gorecki experienced with IVIG infusions. On October 22, 2019, Ms. Gorecki told Dr. David M. Walters that she was "tolerating Hizentra Immune Globulin subcutaneously without adverse effects." R. 1067. On October 29, 2019, Ms. Gorecki's oncologist noted that she was "now receiving Hizentra through an allergist," and would "receive her fourth injection tomorrow." R. 1219. Ms. Gorecki stated that "perhaps her sinus infections have improved," and the medical record does not reflect complaints of side effects related to the Hizentra. R. 1219.

However, on November 4, 2019, Ms Gorecki told Dr. Weily Soong that she was "having nausea, joint pain and increased fatigue[] after starting her infusion (Hizentra 16 grams weekly)." R. 1104; *see also* R. 1141 ("She also reports that she has increased fatigue and nausea after her hizentra infusions. We discussed other options such as gammunex and cuvitru[.]"). She also stated that Zofran and Phenergan did not alleviate her symptoms. R. 1104. On November 18, 2019, Ms. Gorecki told Dr. Soong that "her nausea [wa]s better" and that she was "avoiding

dairy for the most part and thinks this has helped her nausea." R. 1110. She also stated that Zofran helped. R. 1110. Ms. Gorecki told Dr. Soong that "[s]he would like to stick to Hizentra instead of trying a different option as discussed . . . on her last visit." R. 1110.

Ms. Gorecki returned to Dr. Walters on December 2, 2019, and his records state that "[s]he remains on Hizentra for hypogammaglobulinemia." R. 1339. Dr. Walters' plan of care including to "[c]ontinue Hizentra" without mention of any side effects. R. 1339.

On February 24, 2020, July 20, 2020, and August 5, 2020, Ms. Gorecki told Dr. Soong that she was "pre-medicating" before her Hizentra infusions with Tylenol and Benadryl and is "tolerating well" the weekly infusions. R. 1092, 1095, 1098. Specifically, on February 24, 2020, the summary notes state that Ms. Gorecki was "self infusing Hizentra once weekly" and "tolerat[]ing Hizentra, but she feels like she is getting sick just as frequently, but the duration of illness is shorter." R. 1102.

The medical records do include reports of fatigue, however the evidence does not support a finding that Ms. Gorecki's fatigue is solely a result of the Hizentra infusions. *See, e.g.,* R. 696, 709, 724, 729, 752, 967, 1079, 1111, 1196, 1222, 1237, 1254, 1266, 1272, 1394, 1399, 1404, 1424 (review of symptoms states Ms. Gorecki positive for fatigue with no cause indicated). Before beginning the Hizentra infusions, December 3, 2018 medical records indicate Ms. Gorecki had "been off

work for a week now with fatigue." R. 1379. Both before and after beginning the Hizentra infusions, Ms. Gorecki reported to her oncologist that she feels "chronically fatigued," and this report is not tied to her infusions. R. 1263 (May 1, 2018); R. 1251 (October 30, 2018); R. 1234 (April 30, 2019); R. 1075, 1219 (October 29, 2019). Fatigue is also reported as a symptom of Ms. Gorecki's gastroesophageal reflux disease, upper respiratory infections, and a recent hysterectomy. R. 765–66, 1193.

The ALJ specifically acknowledged that Ms. Gorecki needed breathing treatments and infusions. R. 26. To the extent the ALJ mischaracterized Ms. Gorecki's testimony regarding the length the alleged side effects from infusions (four hours versus four days), R.26, this error was harmless. This error does not affect the medical evidence cited above that Ms. Gorecki tolerated Hizentra and did not report untreated side effects to her medical providers. The ALJ specifically acknowledged Ms. Gorecki's fatigue and crafted the residual functional capacity to accommodate it. He wrote that "complaints of fatigue . . . [are] accommodated by the restriction to the light exertional level," with additional limitations. R. 31.

The medical records cited by the ALJ – recitations of numerous medications, including breathing treatments, inhalers, and infusions, without untreated or debilitating side effects – supports the ALJ's finding that Ms. Gorecki's allegations of disabling limitations were not consistent with the evidence. The ALJ was not clearly wrong to discredit Ms. Gorecki's testimony.

**B. The ALJ's Finding Regarding Ms. Gorecki's Headaches**

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual claiming benefits must prove that he is disabled. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). The burden is on the claimant to introduce evidence in support of his application for benefits. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003). The governing regulations establish a five-step sequential evaluation process for determining whether an individual is disabled and thus eligible for benefits or supplemental security income. 20 C.F.R. §§ 404.1520, 416.920. The evaluator follows the steps in order. *See id.*

At the second step of the evaluation, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii), (c). Absent such impairment, the claimant may not claim disability. *Id*. A "medically determinable impairment" is one that "result[s] from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1521. A medically determinable impairment "must be established by

17

objective medical evidence from an acceptable medical source." *Id.* The ALJ will not use "symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment[]." *Id.* After an ALJ establishes that a claimant has a medically determinable impairment, the ALJ will determine if that impairment is severe. *Id.*

"The finding of any severe impairment . . . is enough to satisfy step two because once the ALJ proceeds beyond step two, he is required to consider the claimant's entire medical condition, including impairments the ALJ determined were not severe." *Burgin v. Comm'r*, 420 F. App'x 901, 902 (11th Cir. 2011). "Nothing requires that the ALJ must identify, at step two, all of the impairments that should be considered severe." *Heatly v. Comm'r*, 382 F. App'x 823, 824–25 (11th Cir. 2010) (stating "all that step two requires" is that the ALJ concluded the claimant "had a severe impairment").

The Commissioner published SSR 19-4p, Evaluating Cases Involving Primary Headache Disorders, to provide guidance for claimants to establish they have a medically determinable impairment of a primary headache disorder. SSR 19-4p, 2019 WL 4169635 (August 26, 2019). "Primary headaches occur independently and are not caused by another medical condition. Secondary headaches are symptoms of another medical condition such as fever, infection, high blood pressure, stroke, or tumors." *Id.* at *3. Migraines are an example of a primary headache disorder. *Id.* A primary headache disorder is "typically severe enough to require

prescribed medication and sometimes warrant emergency department visits." *Id.* "[P]hysicians diagnose a primary headache disorder only after excluding alternative medical and psychiatric causes of a person's symptoms." *Id.* at *4. "Physicians diagnose a primary headache disorder after reviewing a person's full medical and headache history and conducting a physical and neurological examination." *Id.*

It is the ALJ's exclusive responsibility to assess the claimant's residual functional capacity. *Moore v. Comm'r*, 649 F. App'x 941, 945 (11th Cir. 2016). The Eleventh Circuit has held that, even when the ALJ could have been "more specific and explicit" in his or her findings with respect to a claimant's "functional limitations and work-related abilities on a function-by-function basis," those findings nonetheless satisfy the requirements of SSR 96-8p if the ALJ considered all of the evidence. *Freeman v. Barnhart*, 220 F. App'x 957, 959–60 (11th Cir. 2007); *see also Castel v. Comm'r of Soc. Sec.*, 355 F. App'x 260, 263 (11th Cir. 2009) (an ALJ's finding is sufficiently detailed despite lacking an express discussion of every function if there is substantial evidence supporting the ALJ's residual functional capacity assessment). In addition, the ALJ is not required to "specifically refer to every piece of evidence in his decision," so long as the decision is sufficient to allow the court to conclude that the ALJ considered the claimant's medical condition as a whole. *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005).

Ms. Gorecki argues that the ALJ's finding that her headaches were not a medically determinable impairment was an error. Doc. 11 at 13. Additionally, she argues that the ALJ's residual functional capacity "failed to account for limitations associated with Gorecki's headache disorder." *Id.* at 13, 15.

At step two of the sequential evaluation, the ALJ wrote:

> The claimant testified to experiencing migraine headaches, and treatment notes make reference to a history of migraine headaches. However, the evidence does not show that prior to making a diagnosis of migraine headaches, that an acceptable medical source, reviewed the claimant's medical history, conducted a physical examination, and made the diagnosis of migraines only after excluding alternative medical and psychiatric causes of the person's symptoms. Thus, under SSR 19-4p, the claimant's migraines/primary headache disorder cannot be established as a medically determinable impairment (Exhibits 9F, 10F, 11F, 17F, 20F, 23F and 25F).

R. 23.

In his formulation of Ms. Gorecki's residual functional capacity, the ALJ referenced Ms. Gorecki's hearing testimony: "The claimant also reported experiencing migraine headaches and that she has about eight migraines a month which can last two to four days." R. 26. The ALJ also stated that Ms. Gorecki takes medication for her headaches. R. 26. Additionally, throughout his recitation of the medical records, the ALJ noted headaches where they appeared in treatment notes. R. 29–30.

The medical records cited by Ms. Gorecki precede the alleged onset date of disability. In August and September 2017, Ms. Gorecki was treated for headaches at St. Vincent's. R. 331–49; 390–99. She reported that she had "never had any episodes of this in the past." R. 331. The records include as a diagnosis: "Headache, likely migraine headache. Other differential diagnosis include tension headache and caffeine related headache." R. 334. Ms. Gorecki was "advised to discuss with her oncologist about changing the IVIG to subcutaneous IgG because the Privigen is giving her headache." R. 334. Ms. Gorecki stated that "every time she gets" "her IgG treatment with Privigen" "she develop[s] severe headache." R. 335; *see also* R. 336, 342, 348, 612, 694, 761, 1075. Ms. Gorecki's mother reported that she "has had chronic migraines since the age of 6" and "has been worsening with some of her IgG treatment." R. 336. In September 2017, Ms. Gorecki reported increased migraines and was going to do physical therapy. R. 762.

There are references to a history of migraine headaches throughout the medical records. *See, e.g.*, R. 676, 687, 694, 700, 711, 717, 810, 1092, 1095, 1138, 1146, 1310, 1316, 1385, 1388, 1394. Ms. Gorecki was prescribed Topamax and Imitrex for her headaches. *See, e.g.*, R. 676, 687, 694, 718, 1311, 1387.

The medical records also include complaints of headache when Ms. Gorecki was treated for other underlying illnesses. For example, on July 22, 2019, Ms. Gorecki presented to Dr. Walters for treatment of recurrent sinusitis and

tracheobronchitis and reported "[i]ntermittent headache." R. 546. On October 22, 2019, Ms. Gorecki presented to Dr. Walters for treatment of sinusitis and reported "headache." R. 1067. There are also instances in the medical records where Ms. Gorecki did not complain of headaches. *See* R. 748, 1078, 1196, 1199, 1222, 1225, 1414, 1424.

On August 14, 2019, Ms. Gorecki saw Dr. Soong, and the visit notes discuss her headaches:

> She had IG replacement in 2017 per Dr. Bondley. She could not tolerate due to headache and shooting neck pain. She tried Octagam, Privigen and 2 others. She pre-medicated with Tylenol and benadryl and phenergan. Never pre-medicated with steroid. She did see neurology in 2017 that thought it was asceptic meningitis – LP done in hospital. Required blood patch s/p LP. She used morphine in hospital for headache. Daily she uses Topamax and Imitrex prn for headache.

R. 694. Dr. Soong stated Ms. Gorecki had a past medical history of migraines. R. 694.

On August 22, 2019, Ms. Gorecki presented to Dr. Rebecca Miller for her annual exam. R. 730. She reported a headache that was "unilateral; temporal; parietal; right sided only." R. 733. She stated that it was "not the worst headache ever" and "similar to previous headaches." R. 733. She stated she was experiencing moderate headaches, once a month, that were triggered by life events. R. 733. The assessment from this visit stated that for Ms. Gorecki's "[m]igraine without aura"

she was "stable and w[ould] stay on imitrex and topamax," and Dr. Miller would recheck her iron and Vitamin D levels. R. 735. Dr. Miller treated Ms. Gorecki on August 16, 2021, and included as a diagnosis: "Chronic migraine without aura, intractable, without status migrainosus." R. 1430.

Ms. Gorecki testified that she has "migraine headaches pretty significantly" for which she takes three medications. R. 49. She testified that she "probably" has "at least eight [migraine headaches] a month," and they "can last anywhere from two days . . . up to four days." R. 52–53.

The ALJ's discussion of Ms. Gorecki's headaches at both step two and in his residual functional capacity formulation are supported by substantial evidence. *First*, at step two, the September 2017 medical records cited by Ms. Gorecki do not support her argument that the ALJ erred under SSR 19-4p. Instead, the records indicate that the cause of Ms. Gorecki's headaches was the Privigen infusions she was receiving. As discussed above, Ms. Gorecki stated she developed a severe headache after each Privigen infusion, and doctors advised her to discuss using a subcutaneous method instead. And, the records indicate that because of these side effects, the Privigen injections were discontinued. Ms. Gorecki has pointed to no other evidence satisfying the requirements of SSR 19-4p. The record does include references to a history of migraine headaches, as noted by the ALJ. However, the record is void of a diagnosis made by an acceptable medical source after reviewing the claimant's

medical history, conducting a physical examination, and excluding alternative causes. Thus, substantial evidence supports the ALJ's decision under SSR 19-4p.

*Second*, the ALJ's residual functional capacity as related to Ms. Gorecki's headaches is supported by substantial evidence. The ALJ specifically referred to Ms. Gorecki's testimony regarding her headaches, as well as medical records when forming the residual functional capacity. R. 25–31. Although Ms. Gorecki testified that she experienced eight migraines a month lasting two to four days, the medical evidence does not support this assertion. Instead, aside from the side effects of Privigen infusions, Ms. Gorecki has pointed to no medical records supporting the number or duration of her headaches. And while the record clearly indicates – as recited by the ALJ – that Ms. Gorecki takes medication for her headaches, there is no indication that such medications cause any adverse side effects. The ALJ did not specifically mention Ms. Gorecki's headaches when discussing the functional limitations in her residual functional capacity. *See* R. 31. However, the ALJ generally opined that Ms. Gorecki's "description of her impairments and resulting limitations are not entirely consistent in light of the medical history, reports from examining practitioners and clinical findings on examination." R. 31. Also, the ALJ stated that "[d]espite claiming a complete inability to work, the record provides no convincing evidence over time, and the undersigned cannot find the testimony and alleged limitations of the claimant to be well-supported by the evidence of record."

R. 31. Substantial evidence supports the ALJ's decision with respect to Ms. Gorecki's headaches.

### C. Ms. Gorecki's Federal Vacancies Reform Act Claim

Ms. Gorecki argues that the Federal Vacancies Reform Act does not contain a spring back provision, and, therefore, the ALJ in this case was not properly appointed under the Appointment Clause of the United States Constitution. Doc. 11 at 17–27. The undersigned rejects the Appointment Clause argument for the reasons articulated by the only appellate courts to rule on this issue. *Rush v. Kijakazi*, 65 F.4th 114, 118–24 (4th Cir. 2023); *Dahle v. Kijakazi*, 62 F.4th 424 (8th Cir. 2023). This ruling follows rulings by other district courts in this circuit. *See Garcia v. Kijakazi*, No. 22-cv-60757, 2023 WL 2540441, at *7–*12 (S.D. Fla. Mar. 1, 2023), *adopted by* 2023 WL 2536491 (S.D. Fla. Mar. 16, 2023); *Wolff v. Comm'r of Soc. Sec.*, No. 2:22-cv-117-SPC-NPM, 2023 WL 1967586 (M.D. Fla. Feb. 13, 2023).

### V.   Conclusion

The ALJ's determination that Ms. Gorecki is not disabled is supported by substantial evidence. The Commissioner's final decision is therefore affirmed. A separate order will be entered.

**DONE** and **ORDERED** this 26th day of September, 2023.

_____
**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE